UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
AL JOSEPH,

       Plaintiff,      REPORT AND
                RECOMMENDATION

 -against-           03 CV 2470 (NG) (RML)

WORLDWIDE FLIGHT SERVICES, INC.,

       Defendant.
----------------------------------------------------------------X

LEVY, United States Magistrate Judge:

   Plaintiff Al Joseph ("Plaintiff" or "Joseph") commenced this employment discrimination action in May 2003 against defendant Worldwide Flight Services, Inc. ("defendant" or "Worldwide"). Lengthy settlement discussions took place between March 2004 and February 2005, but plaintiff rejected the court's negotiated settlement offer and expressed a desire to go to trial. On June 28, 2005, a stipulation of discontinuance was filed in this court. Joseph filed a Notice of Appeal on July 25, 2005, claiming that his attorney had settled the case without his consent. The Second Circuit remanded the case on March 16, 2006 "so that the record may be developed." Joseph v. Worldwide Flight Services, 05-4077-CV, slip op. at 2 (2d Cir. Mar. 16, 2006). I held factual hearings on May 3, 2006 and September 14, 2006.[1] By order dated February 28, 2007, the Honorable Nina Gershon, United States District Judge, referred the remanded issues to me for a report and recommendation. For the reasons stated below, I respectfully recommend the court enforce the June 28, 2005 settlement.

---

[1] I also conducted several settlement conferences after the remand.

**BACKGROUND FACTS**[2]

Joseph worked at Worldwide for several years until August 2001. (Complaint, dated May 13, 2003 ("Compl."), ¶¶ 9, 14.) He filed this lawsuit in May 2003, alleging that Worldwide had discriminated against him due to his disability, race and age. (Compl. ¶¶ 19-22, 30, 54, 66.) At the time of filing, plaintiff was represented by Joseph Turco. In December 2003, defendant filed an answer, and shortly thereafter plaintiff stipulated to dropping some of his claims and narrowing his causes of action. In March 2004, Joseph discharged Turco.[3] Further settlement conferences occurred with plaintiff appearing *pro se*.

In October 2004, after lengthy settlement discussions, Joseph and Worldwide reached a settlement in principle, which was placed on the record. (See Transcript, dated Oct. 6, 2004 ("Oct. 6 Tr."), at 5.) Under the terms of the settlement, defendant agreed to pay Joseph $25,000. (Id.) In addition, defendant agreed to give plaintiff a letter acknowledging his satisfactory performance during his employment with the company. (Id. at 6.) The letter was also to indicate that Joseph was not fired from Worldwide, but rather that his position was eliminated. (Id.) In exchange, Joseph was to sign a stipulation of discontinuance and a release of liability. (Id.) I discussed with plaintiff the purpose and meaning of the stipulation and release (id. at 7-9), and he appeared amenable to signing such an instrument. (Id. at 10.) Defendant's counsel agreed to send Joseph the relevant paperwork within two weeks of that conference. (Id. at 11-12.)

---

[2] The following facts are undisputed, unless stated otherwise.

[3] Plaintiff discharged Turco because he agreed to a $9,000 settlement without plaintiff's consent.

The finalization of the settlement took too long for Joseph. In December 2004, plaintiff wrote the court to state that he had waited too long for the settlement money and no longer wanted to settle. (Letter from Al Joseph to the court, dated Dec. 7, 2004.) I conducted a telephone conference in January 2005 which did not resolve the matter. In February 2005, I conducted an in-person settlement conference.

At that conference, Joseph described how troubled his financial situation had become. (Transcript, dated Feb. 17, 2005 ("Feb. 17 Tr."), at 4.) He stated that he did not "think [he] could agree for [sic] the settlement any longer because it was not going to do [him] any good at this point." (Id. at 4-5.) He expressed anger toward defendant for taking so long to consummate the settlement that he ended up in great financial distress. (Id. at 10-11.) Joseph stated that he had been under the impression that when the time frame "two weeks" was mentioned at the October 6, 2004 conference (Oct. 6 Tr. at 11-12), defendant was agreeing to send him a check within two weeks. (Feb. 17 Tr. at 12-13.) Plaintiff indicated that he was attempting to retain new counsel (id. at 12), and that he wished to proceed to trial because he would "have a better chance of winning this case [at trial] . . . than getting the $25,000 at this point."[4] (Id. at 16.) He also stated that he objected to some of the language in the stipulation and waiver. (Id. at 22-23, 34-35.)

Counsel for defendant and I went over the stipulation with plaintiff to see if there was any language he wanted changed. (Id. at 36-41.) To avoid further delay, I offered to order defendants to give plaintiff a check within a specified time frame. (Id. at 29-31, 44.) I also

---

[4] Plaintiff stated that he believed he would never have heard from defendant's attorney regarding finalizing the settlement had he not contacted her three months after the October 2004 conference. (Feb. 17 Tr. at 19.)

offered to send a notice to Joseph's mortgage company indicating that he had a sum of money forthcoming and suggesting that it should postpone its foreclosure proceedings against him. (Id. at 31, 44, 46-47.) Notwithstanding these attempts to address plaintiff's problems with the agreement, he rejected the $25,000 settlement offer. (Id. at 49-50.) I set a discovery deadline of August 31, 2005. At the conclusion of the February conference, defendant's counsel agreed to give Joseph one more day to consider whether to accept the settlement. (Id. at 54-55.)

At this point, the parties' allegations diverge. It is undisputed that a stipulation of discontinuance between plaintiff and defendant was filed in this court on June 28, 2005. It is also undisputed that plaintiff did not sign the stipulation; rather, his attorney, Peter Ronai ("Ronai"), signed it for him. Joseph appealed the settlement agreement in the Second Circuit, and the Court of Appeals issued its mandate on March 16, 2006, remanding the case for factual development regarding the validity of the settlement agreement and the stipulation of discontinuance. I heard plaintiff's sworn testimony on May 3, 2006. I also held a conference on July 18, 2006 and an evidentiary hearing on September 14, 2006. At the latter, I took testimony from plaintiff, defendant's counsel, and Peter Ronai. Ronai's former investigator also testified at the hearing.

Plaintiff's version of the events between the February 2005 failed settlement conference and the June 2005 filing of the stipulation of discontinuance are roughly as follows: plaintiff telephoned Ronai's law firm, Ronai and Ronai, LLP ("Ronai and Ronai"), sometime in early 2005 and spoke with Ronai, who indicated to plaintiff that he would be able to settle the

case for more than defendant's previous settlement offer of $25,000.[5]  (See Transcript, dated Sept. 14, 2006 ("Sept. 14 Tr."), at 8; Transcript of hearing, dated May 3, 2006 ("May 3 Tr.") at 4, 10-11.)  Soon thereafter, an investigator from Ronai and Ronai visited Joseph's home and collected his notes and case files to copy and return to him at a later date.[6]  (Sept. 14 Tr. at 9-11.)  The investigator gave him "some papers to sign," but Joseph did not recall exactly which documents he signed during the visit.  (May 3 Tr. at 8, 10-11.)  At one point in his testimony he recalled that he had signed a document authorizing Ronai to represent him and to try to reach a settlement.  (Sept. 14 Tr. at 8.)  When Ronai showed him a signed power of attorney at the September 14 hearing, Joseph agreed that the signature was his and stated, "I think this might have been the paper that I signed." (Id. at 11.)  He did not recall signing anything else during the home visit.  (Id. at 11, 38.)  Joseph also stated that he had not filled in any of the information in the power of attorney other than his signature.  (Id. at 16.)

Later in the September 14 hearing plaintiff was shown several other documents containing his signature.  (See Sept.14 Tr., Exs. 1-4.)  When confronted with his signature on a retainer agreement between himself and Ronai and Ronai, plaintiff conceded, "I might have signed this paper but there was nothing on the paper when I signed it." (Id. at 36.  See also id. at 38.)  He was also shown a copy of a "Wrongful Termination Fact Sheet" (id., Ex. 3), which contained the underlying factual details of his case.  Counsel for Worldwide asked plaintiff if he

---

[5] At all three 2006 court appearances, plaintiff had difficulty remembering the time or the particular dates of the events involved.  (See, e.g., Transcript, dated Sept. 14, 2006 ("Sept.14 Tr."), at 7.)

[6] The investigator, Oscar Ruiz, testified at the September 14 hearing.  (See Sept. 14 Tr. at 27-40.)  A worksheet filled out by Mr. Ruiz and plaintiff during that visit is dated March 24, 2005.  (See id., Ex. 3.)

recognized the document, and he agreed that the signature on the bottom looked like his. (Sept. 14 Tr. at 40-41.) Defendant's attorney then asked, "[i]s this the document that you said might have been filled out at the time you signed it?" (Id. at 41.) Plaintiff answered "yes." (Id.) He added that the investigator had not properly explained the meaning of all the papers, and stated, "I remember that I only signed one sheet at the time that he came to my house. I did not sign this multitude of sheets that [the investigator] is presenting to me" now.[7] (Id. at 38-39.)

Joseph maintains that he had little contact with his lawyer between the time that the investigator visited his house in the spring of 2005 and the date of the settlement. (May 3 Tr. at 12.) He said that he spoke to a secretary at the law office a few times and visited the office once, in or around around late April 2005. (May 3 Tr. at 11.) During that visit, Ronai reiterated his promise that he would be able to get Joseph more money than he had initially bargained for. (Sept. 14 Tr. at 12-13.) Thereafter, plaintiff alleged, Ronai never notified him that a settlement had been reached. Joseph stated that he only learned that the case had been settled when he came to this court in person, in mid-July 2005, to seek an extension of a discovery deadline.[8] (Id. at 13-14.) According to plaintiff, he never authorized Ronai to finalize a settlement, and Ronai never informed him that the case had been settled. (May 3 Tr. at 4.) On July 19, 2005,

---

[7] It bears noting that Joseph's testimony regarding this meeting changed over the course of the 2006 hearings and conferences. At the September hearing he testified that he signed only one document when he met with the investigator (Sept.14 Tr. at 10-11, 38), while in earlier sworn testimony he indicated that he had signed "some papers" during that meeting. (See May 3 Tr. at 8.) Further, Joseph first claimed that the document he signed was the power of attorney (Sept. 14 Tr. at 11), but later he said it had been the "Wrongful Termination Fact Sheet." (Id. at 41.)

[8] Plaintiff explained that he had come to the courthouse himself to extend the discovery deadline because he was worried that his attorney was not doing a good job representing him. (Sept. 14 Tr. at 13.)

plaintiff sent a letter to the court in which he described the above-outlined sequence of events. (See Letter of Al Joseph, dated July 19, 2005.) He asked me to set aside the stipulation because he had not agreed to it. (Id.) On July 25, 2005, plaintiff filed his notice of appeal, which discontinued this court's jurisdiction over the matter.

Plaintiff testified that on or around August 16, 2005 Ronai sent him a letter which included a check for $16,666.67, representing the settlement amount minus the attorney's fee. Rather than cash the check, Joseph returned it to his attorney. (May 3 Tr. at 3.) Plaintiff was upset that Ronai had settled the case for $25,000, which was the same amount that he had been able to secure for himself in prior settlement negotiations. (May 3 Tr. at 4; Sept. 14 Tr. at 63.)

Plaintiff's version of the facts was contradictory as to key issues. Most notably, plaintiff initially stated at the May 3 hearing that he did not sign the settlement agreement, claiming that Ronai signed it on his behalf. (May 3 Tr. at 4-5.) Once he was placed under oath, however, and shown a copy of the settlement agreement, dated April 7, 2005, Joseph acknowledged that it was his signature on the page but maintained that he did not recall signing it. (Id. at 7.) At the September 14 hearing, plaintiff speculated that he had signed a blank sheet of paper and that Ronai had "filled in the rest of the stuff" (i.e., the settlement agreement). (Sept. 14 Tr. at 8, 14.) He acknowledged that he "really didn't pay too much attention to the paper" he had signed. (Id. at 14.) He went on to state, "[t]his does appear to be my signature but I never signed that. I am sure that I never signed that because . . . this was the same document that [former defense counsel] brought to me and I did not sign it. . . . I am sure that I [would] have

recalled if I signed this paper."[9] (Id. at 19-20; see also id. at 23-24.)

Ronai's account of his relationship with Joseph differs from his client's in several important respects. He agrees that plaintiff first contacted him by telephone and that he soon thereafter sent his investigator to meet with plaintiff at his home. (Id. at 26.) His investigator, Oscar Ruiz, testified at the September 14, 2006 hearing. Ruiz stated that he had worked as an investigator for Ronai and Ronai for six years and was currently in the Port Authority Police Academy. (Id. at 28.) He stated that he personally recalled interviewing Joseph about the facts of his employment with defendant and his termination from that employment. (Id. at 29.) Ruiz remembered jointly filling out a fact sheet with Joseph, dated March 24, 2005. (See id., Ex. 3.) According to Ruiz, Joseph also discussed the details of his lawsuit, and described the $25,000 settlement offer. (Sept.14 Tr. at 31.) Ruiz also testified that plaintiff signed the power of attorney which Ruiz then notarized before leaving. (Id. at 33.) Ruiz stated that Ronai had filled in a few pieces of information at the top of the power of attorney form prior to the home visit. (Id. See also id. Ex. 1.) During the home visit, Ruiz also had Joseph sign a retainer agreement. (See id., Ex. 4.) The fee agreement indicated that Ronai & Ronai would charge one-third of any amount recovered plus costs. (Id. at 35.) Ruiz expressly recalled that neither the retainer nor the power of attorney were blank pieces of paper when Joseph signed them. (Id. at 37.)

Ronai also testified. He stated that after the home visit, he spoke to plaintiff and warned him that he "could not make any promises [sic] to the outcome now that the settlement offer was off the table." (Id. at 43.) His initial plan was to attempt arbitration with defendant,

---

[9] Plaintiff also speculated that the settlement agreement was one of the papers he had signed when an assistant to Ronai had come to his house to interview him. (May 3 Tr. at 8.)

and he contacted defense counsel to initiate that process. (Id.) However, that plan changed after the home visit, as plaintiff "became very desperate because his house was about to be foreclosed. He want[ed] to settle at all costs." (Id. at 43-44.) As a result, Ronai contacted Worldwide's counsel and "pleaded with her to please put [the original $25,000 offer] back on the table." (Id. at 44.) In early April Worldwide agreed to renew their offer, albeit reluctantly because of Joseph's history of changing his mind. (Id. at 45.) Ronai then called Joseph into his office to explain the terms of the settlement. (Id.) Ronai testified:

> [a]nd I told him . . . I can still try and negotiate with them and try and get them more but if you're in a hurry, you know, if you have to save your house, you have to save your house. He signed the release. I then FedExed and faxed the release to [defense counsel,] . . . and I asked her to hurry . . . because the client would be losing his house. We also negotiated for a letter of neutrality. I okayed it. I read it to the client. We went over it. He was happy with it.

(Id. at 45.) The April meeting at Ronai's law office was very brief. (Id. at 57.) Nevertheless, Ronai insisted that Joseph "absolutely" understood the terms of the settlement and the fee structure, and that he expressed no reservations about the matter. (Id. at 58-59.) In June 2005, Ronai received a check from defendant, deducted his fee, and sent the remainder to plaintiff on June 17, 2005.[10] (Id. at 46, 49. See also id., Ex. 6 (copy of check, dated June 17, 2005).)

---

[10] Ronai explained why it took two months from the time Joseph signed the settlement agreement to when the check was mailed. (Sept.14 Tr. at 59-63.) Approximately one month after Joseph signed the agreement, Ronai asked defense counsel why the check still had not been issued. (Id.) Worldwide's attorney answered that she was unsure of how to make out the check, and Ronai clarified the settlement agreement by amending it with a note, faxing the new version and then mailing it to defense counsel. (Id. at 61-62; see also id. Ex. 9.) This May 4, 2005 interaction between Ronai and defense counsel explains why there are two versions of the settlement agreement; Ronai had initially sent out one version in April, which states "[p]ayment shall be made . . . payable to 'Al Joseph'." (Id. Ex. 2.) The later version, altered on or around May 4, states "payable to 'Al Joseph' and Ronai and Ronai jointly" and is initialed "P.R. – Al

(continued...)

However, on July 25, 2005, Joseph returned the check because, as Ronai stated, "it turned out that Mr. Joseph is quite a good attorney and was able to stop his house from being foreclosed. . . [a]nd he didn't want the money anymore because he wasn't desperate anymore." (See id., Ex. 7 (certified envelope in which Joseph returned the check to Ronai's law firm); Sept.14 Tr. at 46.) Ronai further claimed that he had done some research on the public records relating to plaintiff's house and stated that he learned that the house had been taken out of foreclosure proceedings around June 14, 2005, three days before the settlement check was mailed to plaintiff.[11] (Sept.14 Tr. at 51-53; see also id., Ex. 8.) On August 15, 2005, Ronai sent Joseph a letter by certified mail explaining that it was not possible to change one's mind about a settlement agreement once it is already signed and filed with the court. (Sept. 14 Tr. at 46.) That letter, as well as the return receipt signed by a "P. Joseph," was entered into evidence at the September 14 hearing. (See id., Ex. 5.)

In responding to Ronai's testimony, Joseph acknowledged that he was in desperate financial straits and said that he had filed for bankruptcy while waiting for Ronai to settle the case. (Id. at 17, 63.) He disagreed with Ronai's characterization of his predicament and expressed his anger at the way Ronai had represented him. In a final statement during the September 14 hearing, he said:

> I don't know how he could state something like that, that my conditions got better [and t]hat's why I changed my mind. My

---

[10](...continued)
Joseph by Peter Ronai." (Id.)

[11] At the September 2006 hearing, plaintiff explained that at some point the house had been taken off the foreclosure calendar because he had filed for bankruptcy. (Sept. 14 Tr. at 53.)

-10-

> conditions got considerably worse . . . and that is one of the
> reasons why I don't think that I could accept him giving me less
> than I had originally bargained for. He told me that he was going
> to get me more money. I don't know why he couldn't bargain for
> his money instead of taking all of my money. You know, this is
> what really disturbs me. If he cannot bargain for himself, how
> could he bargain for me?

(Id. at 63.) During his closing statements, Joseph did not repeat his claims that he had not signed the settlement agreement or the power of attorney.

## DISCUSSION

It is the client, and not his attorney, who makes the ultimate decision whether or not to settle a case. See United States v. Beebe, 180 U.S. 343, 350-53 (1901); Fennell v. TLB Kent Co., 865 F.2d 498, 501-02 (2d Cir. 1989). However, "because of the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements, we presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so."[12] In re Artha Mgmt., Inc., 91 F.3d 326, 329 (2d Cir. 1996). The law of agency governs the question of whether or not an attorney has settlement authority. Under federal law, "an agent's authority may be actual or apparent, [and] if it is actual, it may be express or implied." Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 865-66 (7th Cir. 1998) (citing Restatement (Second) of Agency §§ 7-8, § 7 cmt. c (1958)). Here,

---

[12] Because the instant case arises under federal law – namely, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act, 42 U.S.C. § 12201 et seq., and the Age Discrimination in Employment Act, 29 U.S. C. § 623(d) – the question of an attorney's authority to bind a client to a settlement agreement is determined under federal law. See In re Artha Mgmt., Inc., 91 F.3d 326, 328 (2d Cir. 1996).

actual authority may be described as an attorney's client-given power to settle a case.[13]  See Restatement (Second) of Agency § 7 cmt. a.  The Second Circuit has held that "[a]n attorney's actual authority may be inferred from the words or conduct of a client which the client had reason to know would be regarded by the attorney as authorization to settle."  United States v. Manning, No. 95-6402, 1997 U.S. App. LEXIS 2695, at *2 (2d Cir. Feb 12, 1997) (citing United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993)).  See also Restatement (Second) of Agency § 26 (the "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account").

A client who seeks to set aside a settlement entered into by his attorney "bears the burden of proving by affirmative evidence that the attorney lacked authority."  In re Artha Mgmt., Inc., 91 F.3d at 329.  Thus, in order to set aside the settlement agreement and stipulation of discontinuance, Joseph must show with "clear evidence," id. at 330, that Ronai entered into the settlement and stipulation without his consent or approval.  This burden of proof is "not insubstantial."  Int'l Bhd. of Teamsters, 986 F.2d at 20.

---

[13]  The Second Circuit has also held that "if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld."  Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989).  "Apparent authority," in this context, means "'the power to affect the legal relations of [a client] by transactions with third persons, professedly as agent for the [client], arising from and in accordance with the [client's] manifestations to such third persons.'"  United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993) (quoting Restatement (Second) of Agency § 26 Comment c (1958)).  Here, it appears that Joseph did not have any direct contact with defendant after he retained Ronai as his attorney.  Therefore, he never represented to Worldwide that Ronai had the authority to settle his case for him and there was no apparent authority.  In a similar case to the one at bar, however, this court held that "[o]nce actual authority is established, it is unnecessary to examine whether there was apparent authority."  Walker v. City of New York, 05-CV-0004, 2006 U.S. Dist. LEXIS 34345, at *9 (E.D.N.Y. Apr. 4, 2006).

Here, Joseph's signature plainly appears on the settlement agreement, which is dated April 7, 2005. (Sept.14 Tr., Ex. 2.) Plaintiff was certainly familiar with the contents of that agreement; he had examined and discussed the same document in detail during the settlement conferences I held in October 2004 and February 2005. The same signature is on a retainer agreement that clearly sets forth Ronai's contingency fee. (Id., Ex. 4.) His signature also appears on a power of attorney that states Ronai and Ronai is authorized to "execute any and all releases, acquaintances and papers necessary [for the representation of Joseph and] to receive, endorse, deposit and retain for and on [Joseph's]. . . behalf all moneys, checks and proceeds to be received from the defendant . . . in settlement of [Joseph's] . . . claim." (Id., Ex. 1.) Ronai's former investigator, Oscar Ruiz, testified clearly and credibly that he went over these documents carefully with Joseph during a meeting at Joseph's home in March 2005. (Id. at 29-37.) Ruiz stated that during his six years working with Ronai, he often visited prospective clients and would always "explain to [the client] what the paperwork is one by one . . . page by page." (Id. at 30.) Although Joseph denied that he knew what he was doing when he signed these documents and even claimed that he was given a series of blank sheets of paper to sign (id. at 38-39), the more plausible interpretation of these events is that he knowingly and voluntarily retained Ronai and Ronai and granted them the express, actual authority to settle his lawsuit against Worldwide.

Ronai testified credibly that plaintiff came to him desperate to finalize the settlement. (Id. at 43-44.) Plaintiff was unrepresented, he was facing trial, and he feared

foreclosure of his home was imminent.[14] A handwritten note on the retainer agreement stated that Joseph employed Ronai and Ronai to pursue his claim against Worldwide which specifically included "getting OFFER back if so instructed." (Id. Ex. 4 (emphasis in original).) Ronai's authority to settle the case was derived from the retainer agreement, the power of attorney, and Joseph's conversations with him in which he expressly asked Ronai to regain a settlement offer from Worldwide. Most importantly, I find that Ronai consulted with his client before agreeing to the settlement, and, as a result, Joseph's signature appears on the settlement agreement.

While it is clear that the relationship between Joseph and Ronai deteriorated some time between April and July 2005, plaintiff has not produced sufficient evidence to meet his burden of showing by clear, affirmative evidence that Ronai lacked the authority to settle the case on his behalf. I find that Ronai had actual authority to settle the suit. Plaintiff's memory of the events leading up to the settlement is less than clear, and his testimony about which documents he signed and when he signed them was not consistent through the various conferences and hearings I have held with him. He has not proven that either the settlement agreement or the other relevant documents were falsified. Although the stipulation of discontinuance was signed by Ronai on his behalf, Joseph had granted him the authority to sign such a document when he executed the retainer and the power of attorney with Ruiz. Under Second Circuit law and principles of agency, the settlement would have been valid even if plaintiff had not signed the settlement agreement itself.

## CONCLUSION

---

[14] Ruiz testified that during his home visit, he learned that plaintiff had "decided to come to us because at this point, he didn't have any offers or anything of that nature" from defendant. (Sept.14 Tr. at 32.)

I respectfully recommend that the court adopt these factual findings and enforce the settlement agreement between plaintiff and Worldwide. Although it is not generally a factor that courts consider in deciding whether or not to enforce a settlement, I believe that the terms of the settlement are fair and reasonable. Plaintiff had an opportunity to accept the full $25,000 in February 2005, when he was unrepresented. Because he could not bring himself to do so then, he is now obliged to compensate his attorney, who succeeded in convincing the defendant to renew the settlement offer that Joseph had rejected. Plaintiff has alternately expressed ambivalence towards settlement and an urgent desire to settle throughout this case. In this court's opinion, Joseph would be well-advised to accept his share of the settlement proceeds and put this matter behind him.

Objections to this report and recommendation must be filed within ten (10) business days, with a courtesy copy to Judge Gershon and the undersigned. Failure to file objections within the specified time waives the right to appeal the district court's order. See 28 U.S.C. § 636(b)(1).

Respectfully submitted,

/s/
ROBERT M. LEVY
United States Magistrate Judge

DATED: Brooklyn, New York
February 28, 2007